UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

APRIL MCLEAN,
    Plaintiff,

v.

UNIVERSITY OF CONNECTICUT
HEALTH CENTER, CORRECTIONAL
MANAGED HEALTH CARE,
    Defendant.

No. 3:15-cv-1771 (SRU)

# ORDER

On December 2, 2015, the plaintiff, April McLean, filed a complaint against the defendant, University of Connecticut Health Center ("UCH"), alleging one count of unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (doc. 1) On March 2, 2016, UCH filed what I am construing as a partial motion to dismiss the retaliation claim insofar as it is premised on McLean's constructive discharge allegations. (doc. 14)

For the following reasons, UCH's motion is **granted**.

## I. Standard of Review

### A. Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

**II.     Background**

The following allegations are taken from McLean's complaint. McLean, a psychologist, was hired by UCH as a Supervising Psychologist 1 and assigned to the Osborn Correctional Institution on March 9, 2012. Compl. at ¶ 15. Brian Liebel, the Health Services Administrator at the Osborn Correctional Institution, supervised McLean. *Id.* at ¶ 16. Beginning on December 20, 2012, Liebel started referring to McLean as "Hon." and inquiring into her personal, intimate

relationships. *Id.* at ¶¶ 18–19. After learning about those inquiries, McLean sent emails to Liebel asking him to cease his conduct. *Id.* at ¶ 20.

Although the timeline of the complaint is ambiguous, assuming that it proceeds chronologically, McLean alleges that between December 20, 2012 and October 7, 2014, Liebel engaged in a retaliatory course of conduct against her, including:

- Excluding her from Supervisor's Meetings, which she had previously attended, and then docking her performance for failing to attend those meetings, *id.* at ¶¶ 22, 27;

- Excluding her from department "tours;" *id.* at ¶ 23;

- Improperly downgrading her performance ratings in September 2013 and September 2014, *id.* at ¶¶ 25–26, 29;

- Accusing her of violating the attendance policy and, in that accusation, misstating her use of sick days, *id.* at ¶¶ 32–33;

- Failing to conduct "Quarterly Supervision" meetings with her, despite her requests for such meetings and in violation of UCH policy, *id.* at ¶¶ 34–37; and

- Other unspecified "dismissive, condescending, and harassing behaviors," *id.* at ¶ 28.

McLean kept Robert Berger, the Statewide Director of Mental Health and Psychiatric Services, and Paul Chaplin, Director of Psychological Services, informed of the above conduct. *Id.* at ¶¶ 24, 28. On October 7, 2014, she filed a complaint regarding Liebel's sexual harassment and retaliatory conduct with the UCH Office of Diversity and Equality. *Id.* at ¶ 39. McLean's complaint deliberately omitted any reference to Liebel calling her "Hon." out of fear of further retaliation. *Id.* at ¶ 40. Two days later she also filed complaints with the Connecticut

Commission on Human Right and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶ 4i.

On October 1, 2014, Chaplin informed McLean that she was being reassigned to the Northern Correctional Institution, which was "known to be the leas[t] desirable facility in the state for a female staff member."[1] *Id.* at ¶¶ 44, 48. Despite having been assured that she could continue to participate in the "Vets Dogs Program," McLean was removed from the program on November 10, 2014, purportedly to prevent her from inadvertently running into Leibel. *Id.* at ¶¶ 51, 53–54.

During this period, Liebel was not initially relocated, but after five other people complained of his harassment he was removed from the Osborne Correctional Institution on October 20, 2014 and underwent training at two other institutions. *Id.* at ¶¶ 47–48.

On October 23, 2014, Liebel was stationed for the day at the Enfield Correctional Institution. *Id.* at ¶ 55. McLean, who was also stationed at the Enfield facility that day, was apparently notified about Liebel's visit in advance and provided UCH and Liebel with her schedule in order to avoid any inadvertent contact with him. *Id.* at ¶¶ 55, 57. Liebel nevertheless found McLean and attempted to physcially intimidate and question her. *Id.* at ¶ 58.

At some point apparently between October 7 and November 17, 2014, McLean was informed by the UCH Office of Diversity and Equality that its investigation had found that Liebel had not violated any departmental policies. *Id.* at ¶ 59. On October 13, 2014, McLean wrote a letter to the Governor of Connecticut, complaining about Liebel's conduct. *Id.* at ¶ 62. In a letter dated November 17, 2014, Scott Semple, the Interim Commissioner for the Department

---

[1] McLean asserts that the transfer was in retaliation for filing her complaint, and occurred immediately *after* the complaint was filed. *See* Compl. at ¶ 41. It is unclear whether she has mis-alleged the relevant dates in the complaint, or whether she is suggesting she took some other action prior to formally filing the complaint that triggered the allegedly retaliatory transfer.

of Corrections, informed her that the Department would conduct its own investigation into her circumstances. *Id.* at ¶ 63. On February 27, 2015, Judith Garcia, an Equal Employment Opportunity Specialist-2 for the Department of Corrections, informed McLean that she would be returned to the Osborn Correctional Facility and that she would no longer report to Liebel. *Id.* at ¶ 64.

At some point between February 27 and March 15, 2015, McLean requested and was denied a week off for training. *Id.* at ¶ 66. She then requested that the week be unpaid, and although the request was approved by the Health Services Administrator, it was denied by "Central Office" on the basis of "facility need." *Id.* at ¶ 67. Although she describes no further events or conduct, McLean alleges that "because of the continuing retaliation to which [she] was subjected by [UCH], she had no other choice but to resign her position on March 15, 2015. *Id.* at ¶ 68. She describes that resignation as a constructive discharge. *Id.* at ¶ 4.ii.

On June 29, 2015, McLean filed amended complaints with the EEOC and the CHRO including her constructive discharge. *Id.* On November 9, 2015, she received a "Notice of Right to Sue" from the EEOC, and on November 13, she received a release of jurisdiction from the CHRO. *Id.* at ¶¶ 4.iii–iv.

**III.    Discussion**

UCH argues that McLean's allegations of constructive discharge are insufficient to state a claim upon which relief may be granted, and apparently moves to dismiss McLean's retaliation claim insofar as it is premised on constructive discharge. UCH does not, however, attempt to dismiss the retaliation claim—and thus the complaint—in full. *See* Def.'s Br. at 14 n.6 (stating that UCH intends to move for summary judgment on the remainder of the retaliation claim).

5

Accordingly, I consider only whether McLean has adequately alleged facts constituting a constructive discharge.

"[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004) (internal quotation marks and citation omitted). A constructive discharge claim thus requires two elements: "the employer's intentional conduct and the intolerable level of the work conditions." *Id.* With respect to the former, a plaintiff must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" *Id.* at 229–30 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000)). With respect to the second element, the United States Supreme Court has explained that "[t]he inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). It has further instructed that a constructive discharge claim "can be regarded as an aggravated case of [] sexual harassment or hostile work environment," and therefore requires the plaintiff to show "something more" than what is sufficient for those claims. *Id.* at 146–47. Accordingly, the Second Circuit has consistently held that the constructive discharge standard is "a demanding one," which cannot be satisfied by merely difficult or unpleasant working conditions. *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010); *see also Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (AEDA claim); *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985) (Title VII claim).

Applying that standard in the present case, McClean has clearly failed to allege sufficient facts to make out a claim based on constructive discharge. First, she has likely failed to allege that UCH acted deliberately in order to force her to resign. Instead, as UCH points out, the complaint describes some efforts on its part to consider and address McClean's concern, and McClean does not allege that the failure of those efforts was part of a premeditated plan to force her to resign.

More importantly, McClean has not alleged the aggravated harassment required to sustain a constructive discharge claim. Although she claims that the transfer to the Northern Correctional Institution placed her in a "more gender-hostile environment," *Petrosino*, 385 F.3d at 230, she did not resign while she was working at that assignment. Instead, she left just over two weeks *after* she was removed from Leibel's supervision and restored to her preferred location. *See Ternullo v. Reno*, 8 F. Supp. 2d 186, 193 (N.D.N.Y. 1998) (observing that the plaintiff's case was undermined by removal of the allegedly harassing supervisor, and collecting cases holding the same).

McClean recognizes that, much as in *Petrosino*, I must consider whether the allegations regarding UCH's actions after her complaint was formally resolved can plausibly be read as having "ratcheted the harassment us to the breaking point for a reasonable person in [McClean's] situation." 385 F.3d at 230 (internal quotation marks and citation omitted). Accordingly, the gravamen of her argument in support of the constructive discharge claim is that the subsequent denial of a training opportunity indicated that the resolution was superficial and Leibel and/or UCH would continue their retaliatory conduct unabated. *See* Pl.'s Opp'n Br. at 13–14. In support of that contention, McLean points to *Corfey v. Rainbow Diner of Danbury*, 746 F. Supp. 2d 420 (D. Conn. 2010), where the court found that evidence that the defendant failed to conduct an

7

adequate investigation of the plaintiff's complaints and allowed continued harassment were sufficient to support a claim of constructive discharge. *Id.* at 429. But in *Corfey*, the conduct at issue was a persistent stream of sexual remarks made to the plaintiff and her teenage daughter, accompanied by direct interference with the plaintiff's ability to do her job. *Id.* at 424–25. In the present case, by contrast, McLean has alleged only that, on one occasion, she was denied the opportunity to take a week off of work to attend a training. Although McClean may well have been extremely distressed by that denial, "[s]uccess on a constructive discharge claim does not depend upon the plaintiff's subjective beliefs." *Sawka v. ADP, Inc.*, 2015 WL 5708571, at *15 (D. Conn. Sept. 29, 2015) (internal quotation marks, alteration, and citation omitted). McClean simply has not sufficiently alleged that that single event rendered her working conditions so intolerable that a reasonable person would have felt compelled to resign. *Suders*, 542 U.S. at 141. Thus, McClean's constructive discharge allegations, as currently pleaded, must fail.

**IV.  Conclusion**

The defendant's partial motion to dismiss the retaliation claim insofar as it is based on McClean's constructive discharge allegations is **granted**. (doc. 14) The dismissal is without prejudice to repleading within 30 days an amended claim that plausibly alleges constructive discharge.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of March 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

8